**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CAMICO MUTUAL INSURANCE
COMPANY,

        Plaintiff,

v.                            CASE NO.: 3:10-cv-762-J-32MCR

ABRAHAM ROGOZINSKI, et. al.,

        Defendants.

_____

## ORDER

      The question before the Court is whether, under a professional liability insurance policy, the injured parties have multiple claims and are entitled to the benefit of the policy aggregate limit of $2,000,000.00, or whether they have only one claim and are therefore subject to the per claim limit of $1,000,000.00. This declaratory action is before the Court on Plaintiff Camico Mutual Insurance Company's Motion for Final Summary Judgment (Doc. 34) and Defendants Abraham Rogozinski, Marjorie Rogozinski, Chaim Rogozinski, Jeanie Rogozinski, Sam Rogozinski and Randi Rogozinski's Motion for Summary Judgment (Doc. 37). Each party has filed a response to the other's motion (Docs. 46, 47). The Court held a hearing on the motions on May 22, 2012, the record of which is incorporated herein. After the hearing, the Court directed the parties to file a joint stipulation of undisputed facts, which the parties filed along with supplemental memoranda. (Docs. 64,65, 68). The Court relies on the stipulated undisputed facts in making its decision.

**I. Background**

**A. The Rogozinski Brothers' Business Relationship[1]**

After graduating from medical school in 1980, Abraham Rogozinski completed an internship and his orthopedic residency training and joined his brother Chaim, also an orthopedic surgeon, in the Rogozinski Orthopedic Clinic ("ROC") in 1985. (Abraham – P. 5 L. 17 – P. 6. L. 6).   At the same point in time, in 1985, while [another brother,] Sam Rogozinski, worked full-time at a food brokerage firm, he was also working part-time, in an unpaid capacity, handling the financial aspects of ROC. (Abraham – P. 6 L. 7 – 19)[.] Sam testified that he is the chief operating officer of ROC. (Sam – P. 5 L. 7-13). Later, sometime in the late 1980s or early 1990s, Sam became a paid employee of ROC. (Abraham – P. 7 L. 1 – 13). Sam is also the president of the Center for Physical Therapy ("CPT"), which he formed in 1985 or 1986 and which is located in the same building as ROC. (Sam P. 6 L. 2-6 & P. 10 L. 4-6; Abraham – P. 13 L. 10-18) The building housing ROC and CPT is owned by the Rogozinski brothers through an entity known as Rogozinski Properties, LLC. ("RP") (Sam – P. 6 L. 7-21). There are other tenants in the building that pay rent to RP and the three Rogozinski brothers divide any revenue from RP equally among themselves. (Abraham P. 13 L. 10 – P. 14 L. 13; Sam P. 6 L. 17-25)

Abraham testified that he recalls conversations with Chaim and Sam as early as when he and Chaim were both medical residents where they discussed development of medical

---

[1]   Sections A, B, and C of the background is taken virtually verbatim from the parties' Stipulated Statement of Undisputed Material Facts for Cross-Motions for Summary Judgment (Doc. 64), with only minor grammatical editing.   Portions of the stipulated statement unnecessary to the Court's decision have been omitted.

devices. (Abraham – P. 18 L. 1 – P. 19 L. 8)[.] Initially, Sam provided the primary financial support for the inventions, while Chaim was the inventor and Abraham did medical research and gathered statistics to determine whether there was a market for the inventions. ([Id.]; Abraham – P. 22 L. 2- P. 23 L. 16)[.] The brothers opened a joint bank account that was used to maintain the patents. (Abraham – P. 25 L. 6 – P. 26 L. 3)[.]

Commencing in the early 1980's, and for a number of years thereafter, Chaim conceived and developed 18 medical devices and/or implants which were eventually patented in his name by the U.S. Patent Office. (Chaim-P. 8 L. 14-16, P. 10 L. 12-16, P. 19 L. 17-23)[.] With the exception of one medical device, a prosthetic bone joint, all of the devices have been licensed to two separate manufacturers under separate licensing agreements. (Chaim-P. 20 L. 2-6 & P. 25 L. 13-24).

All but one of the 18 patents has been licensed to either Smith & Nephew or EBI BioMet.  (Chaim – P. 19 L. 24 – P. 21 L. 6, P. 25 L. 13-20; DE 1-¶13c-d, DE 18-¶13, DE 19-¶13)[.] All three Rogozinski brothers signed the licensing agreements with Smith & Nephew and EBI BioMet for manufacture, sales and use. (Chaim – P. 97 L. 16 – P. 98 L. 8, P. 100 L. 1-14, P. 111 L. 16 – P. 112 L. 2; Sam – P. 27 L. 20-23). Specifically, in January 1989, the Rogozinski brothers entered into a license agreement with Richards Medical Company for certain of the patents which comprised, collectively, a series of medical devices or implants known as the Rogozinski Spinal Rod System[.] (Chaim – P. 20 L. 2-6, P. 44 L. 5-24). This license agreement was subsequently modified when Richards Medical Company began to operate under the name Smith & Nephew Richards. (Chaim – P. 20 L. 2-6). With respect to the other patents, in March of 1996 the Rogozinski brothers entered into a license agreement

3

with an entity known as EBI, now known as BioMet, in order to license patents that comprised a spondylolisthesis reduction system, also referred to as a spine link system. (Chaim – P. 20 L. 2-22, P. 24 L. 20-P. 25 L. 12, P. 52 L. 14-P. 53 L. 15).

Sam and Abraham testified to their understanding that each of the Rogozinski brothers owns a 1/3 share of each of the 18 patents and that they each considered all 18 patents to be a personal asset. (Abraham – P. 32 L. 8 – P. 34 L. 1; Sam-P. 13 L. 19 – P. 15 L. 8). Chaim testified to his understanding that he was the sole owner of the patents. (Chaim – P. 19 l. 17-25, P. 126 L. 1-19). All three Rogozinski brothers testified that they shared equally, 1/3 each, in the expenses and royalty revenue derived from all 18 patents. (Chaim – P. 62 L. 13-P. 63 L. 4, P. 123 L. 11-P. 124 L. 16, P. 130 L. 20 – P. 131 L. 5; Abraham - P. 17 L 8-17; .Sam – P. 22 L. 6-13). The Rogozinski brothers had a joint bank account for maintenance of the patents. (Abraham – P. 25 L. 6-15). Later the division of revenue was changed to 50% to Chaim and 25% each to Sam and Abraham to reflect the fact that Chaim, as the older brother, would reach retirement age prior to his two younger brothers. (Chaim – P. 131 L. 19-P. 132 L. 14; Sam P. 49 l. 11-16). Sam advised the Presser firm [the accounting firm which was the defendant in the underlying malpractice action] of the change in the brothers' revenue sharing arrangement. (Sam – P. 41 L. 5-16).

In a July 2, 1992 Jacksonville Business Journal article regarding the spine surgical device developed and sold by the brothers, Sam was quoted as saying "we have a perfect division of labor and we thrive off each other. In terms of the project Chaim took care of the engineering, Abe handled the clinic statistics and I was the trouble shooter, taking care of the legal matters." Both Abraham and Chaim testified that they agreed with Sam's statement.

(Abraham – P. 27 L. 12 – 23; Chaim P. 30 L. 7-23).

### B. The Rogozinski Brothers['] Relationship with the Presser Firm

With respect to the relationship between the Rogozinskis and the Presser Firm, Chaim had known Mr. Presser since childhood, and when the Rogozinskis started ROC in 1984 or 1985, the Presser firm became the Rogozinski brothers' accountants; a relationship which continued after Mr. Presser formed his relationship with the Presser Firm, the insured under the Camico insurance policy. (Chaim – P. 68 L. 8-25, P. 120 L. 15-24). The Presser Firm prepared the Rogozinskis' tax returns from 1989 through 2006. As alluded to above, Sam was the primary point of contact between the Rogozinski brothers and the Presser Firm, and he communicated with his brothers regarding the information he was provided by the Presser Firm. (Abraham – P.41 L. 11-14).

When the Rogozinski brothers received 1099s, Sam would forward them to the Presser Firm with instructions on how to divide the income [among] the brothers for federal income tax purposes. (Sam-P. 40 L. 15 – P. 42 L. 20, P. 45 l. 25-P. 46 L. 3). Sam never instructed the accountants on how to treat the income, only on how to divide it. (Sam-P. 46 L. 13-25-P. 47 L. 2-9, 13-22).

In February 2008, Sam Rogozinski learned that the Presser firm had been misclassifying their income from the license agreements as ordinary income as opposed to capital gains income. Charles Curley, the Rogozinski brothers' corporate and tax attorney (Curley-P. 6 L. 12-16, 22-24[)], [had] prepared a memorandum addressed to Sam Rogozinski dated December 1, 2004. (Curley P.6 L. 12-16, 22-25, P. 17, L. 12). He prepared this memorandum after an initial consultation with the Rogozinskis in November 2004 in

regard to the creation of an LLC. While the memorandum primarily addressed the proposed

LLC for the Rogozinski brothers, it also touched on §1235 of the Internal Revenue Code.

§1235 is the IRS code that defines the capital gains treatment of the sale of a license.

(Reynolds-P. 23, L.17-18). Paragraph three of the memorandum reads:

> Currently, each of the Rogozinski brothers receive one-third of the proceeds
> from licensing certain patents that are owned by Chaim Rogozinski. Each of
> the three Rogozinski brothers report the income form the licensing of the
> patents as capital gains under §1235. It is assumed that each of the three
> Rogozinski brothers satisfies the requirements under §1235 to be treated as
> a holder. (Curley-P. 33, L. 20-25 – P. 34, L. 3).

Sam Rogozinski received this memorandum in February 2008. (Sam-P. 28, L. 1-9;

Abraham-P. 42 L. 1-5). Sam called Matthew Edelman to inform him that he had received a

memorandum discussing §1235. Mr. Edelman responded that the section had nothing to do

with the brothers. Sam then requested that Mr. Edelman get in touch with Mr. Curley, and

Mr. Edelman complied. (Sam-P. 31 L. 17-25 – P. 32 L. 8[)]. He contacted Mr. Curley via

telephone. During their conversation, Mr. Edelman informed Mr. Curley that the Rogozinskis'

tax returns had not been reporting the income from the licensing agreements as capital gains

income, but, rather, as ordinary income. (Curley-P. 36 L. 19-25 – P. 37 L. 1[)].

The significance of this is that Rogozinskis' federal income tax liability would have

been substantially less in each of these years if the royalty income had been treated as

capital gains income rather than ordinary income. (Reynolds P. 5 L. 6-25). After this

discovery, Sam Rogozinski contacted Mr. Edelman at the Presser Firm to discuss the issue

with regard to all three Rogozinski brothers. (Sam – P. 31 L. 8-23). There were several

subsequent emails between Sam and Mr. Edelman regarding the treatment of royalty income

6

on the tax returns of all three brothers. (Sam – P. 35 L. 5-12)[.] Later, all three Rogozinski brothers met together with three accountants at the Presser Firm, Messrs. Ranes, Edelman and Giehrl. (Sam – P. 31 L. 8-23; Abraham – P. 42 L. 17- P. 43 L. 20). The Presser firm told the Rogozinski brothers that they would amend their 2004, 2005, and 2006 tax returns, and assured them that everything would be taken care of. (Chaim-P. 77 L. 10-21; Abraham-P. 45, L. 3-8).

Sometime after this meeting, the Presser firm informed the Rogozinski brothers that they would not be following through with the amendments to the tax returns and, as a result, the Rogozinskis engaged a new accounting firm. (Chaim-P. 78 L. 15-21; Abraham-P. 46 L. 11-21). The Rogozinski brothers then hired Peter Reynolds, a licensed CPA, from the Griggs Group. (Chaim-P. 78 L. 22-25; Reynolds-P. 5 L. 20-24). It was Mr. Reynolds who ultimately filed the Rogozinski households' amended tax returns for the years 2004, 2005, and 2006. (Reynolds-P. 6 L. 15-21).

The amended tax returns for those years primarily addressed a reclassification of royalty income received by the Rogozinski brothers from taxable as ordinary income to taxable as capital gains income. (Reynolds-P. 6 L. 22-25 – P. 7 L. 1). In order to prepare the amended tax returns, it was necessary for Mr. Reynolds to examine the source documents – the patent licensing agreements. Mr. Reynolds testified that, after examination of each of the patent licensing agreements, the agreements were written with §1235 of the Internal Revenue Code in mind because the language in the agreements matched that of §1235. (Reynolds-P. 23 L. 7-25, P. 24 L. 1-19, P. 26 L. 12-25 – P. 27, L. 9). The license agreements between the Rogozinskis and BioMet and Smith & Nephew Richards defined the Rogozinski

7

brothers collectively as Rogozinski, and designated them as the designer and owner of the patents. Both agreements were signed by all of the Rogozinski brothers. (Reynolds-P. 23 L. 19-22, P. 26 L. 15-25 – P. 27 L. 9). For example, the 1996 agreement with BioMet stated: "Rogozinski has developed a novel system of implants including a segmental spine linking system, non-spinal applications for said system a universal screw having spinal and non-spinal applications, instrumentation for said system[.] EBI desires to acquire a worldwide license *to make, use, and sell* the technology described above." (The italicized portion is language taken from §1235). (Reynolds-P. 27 L. 24-25 – P. 29 L. 3).

### C. The Underlying Suit

On April 30, 2008, the Rogozinskis brought suit against the Presser firm and nine of its individual employees/partners in state court in Duval County, Florida. (A copy of the complaint filed in [Rogozinski v. Presser], case no. 2008-CA-5779, CV-C was attached as an Exhibit to Camico's Motion for Summary Judgment."). (DE 1-¶12, DE 18-¶12, DE 19-¶12). In counts for professional negligence and breach of fiduciary duty, the underlying complaint alleges that as to each tax year from 1989 through 2006, the Presser firm was negligent in its preparation of the Rogozinskis' federal income tax returns by:

> a. Erroneously recognizing revenues from transfer of patent rights by the Rogozinskis under the 1989 License Agreement and the 1996 License Agreement as ordinary income rather than as the sale of a capital asset held for more than one year;
>
> b. Refusing to file amended federal income tax returns for the Rogozinskis for the 2004, 2005 and 2006 tax years, after the Presser firm recognized its errors in February 2008; and
>
> c. Failing to advise the Rogozinskis until five business days before the deadline for the 2004 tax year that the Presser firm was refusing

8

> to file amended federal tax returns for the  Rogozinskis for the 2004,
> 2005 and 2006 tax years.

(DE 1-¶14, DE 18-¶14, DE 19-¶14).

As a result of the Presser firm's alleged negligence, the only *Damages* [as defined in the Policy] alleged by the Rogozinskis in the underlying complaint were monetary damages due to their overpayment of income taxes to the federal government, and damages related to the overpayments. (See Exhibit A, at ¶¶ 16 and 22.)

**D. The Policy**

Presser sought coverage from Plaintiff Camico Mutual Insurance Company under its Accountants Professional Liability Insurance Policy issued from July 2007 through July 2008. Camico accepted Presser's tender of the Rogozinski claim and appointed counsel to defend the firm.

In June of 2010, Presser and the Rogozinskis settled their suit.   Under the terms of the settlement Presser instructed Camico to pay the remaining sums of the per claim policy limit of $1,000,000.00.  Also, Camico agreed to file the present declaratory action to answer the question of whether the Rogozinski suit asserted two or more separate claims, thereby triggering the Policy's $2,000,000.00 aggregate amount.

The Policy states in pertinent part:

> 1. Limit of Liability - Per *Claim*[2] and Sub-Limits
>
> > The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* is the Per *Claim* Limit of

---

[2]   All italicized words refer to terms defined by the Policy and are italicized in the original.

9

Liability. . . .

A single Per *Claim* <u>Limit of Liability applies to a</u> *Claim* <u>arising from</u> *Multiple Acts, Errors or Omissions*<u>, regardless of the number of claimants, lawsuits, or Insureds involved</u>.

2. Limit of Liability - Policy Aggregate and Aggregate Sub-Limits

The maximum amount payable by the Company for *Damages* and *Claim Expenses* for all covered *Claims* made and reported during the *Policy Period* is the Policy Aggregate Limit of Liability . . . .

Doc. 1, Ex. 1, Form PL-1000-A (rev. 8/05), Section I. INSURING AGREEMENTS, C. Limits of Liability, Sub-Limits and Deductibles (emphasis added).

Further,

(c)     A *Claim* means a demand received by any *Insured* for money or services, and includes the service of suit(s), a request that an Insured agree to waive a legal right or sign an agreement to toll a statute of limitations, or a demand for arbitration. <u>A</u> *Claim* <u>also includes two or more</u> *Claims* <u>arising out of or resulting from a single act, error or omission in rendering</u> *Professional Services*<u>, or from</u> *Multiple Acts, Errors or Omissions* <u>in rendering</u> *Professional Services*<u>, whether such demands are made: (1) against one or more</u> *Insureds*<u>, (2) by one or more</u> *Persons*<u>, or (3) during one or more</u> *Policy Periods*.

(l)     *Multiple Acts, Errors or Omissions* means all acts, errors or omissions in rendering *Professional Services* that are <u>logically or causally connected</u> by any common fact(s), circumstances, situation, transaction(s), event(s) advice or decisions

<u>Id.</u>, Section IV. DEFINITIONS, ¶¶ (c)(l) (emphasis added).

## II.  Interpreting the Policy

"Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." <u>Northland Cas. Co.</u>

v. HBE Corp., 160 F.Supp. 2d 1348, 1358 (M.D. Fla. 2001) (citation omitted). The parties

agree that Florida law governs the interpretation of the Camico Policy.  Florida law requires

that "in construing insurance policies, courts should read each policy as a whole,

endeavoring to give every provision its full meaning and operative effect." United States Fire

Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007).  Additionally, "Florida courts have

said again and again that insurance contracts must be construed in accordance with the

plain language of the policy." Vozzcom, Inc. v. Great Am. Ins. Co., 666 F. Supp. 2d 1332,

1336 (S.D. Fla. 2009)(quoting Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732,

735 (Fla. 2002)).  Indeed, "[i]n construing terms appearing in insurance policies, Florida

courts commonly adopt the plain meaning of words contained in legal and non-legal

dictionaries." Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1263 (11th Cir. 2000) (per curiam).

Here, the relevant portion of the policy states:

> The maximum amount payable by the Company for *Damages* and
> *Claim Expenses* for each covered Claim is the Per *Claim* Limit of
> Liability. . . . A single Per *Claim* Limit of Liability applies to a *Claim*
> arising from *Multiple Acts, Errors or Omissions*, regardless of the
> number of claimants, lawsuits, or Insureds involved. . . . *Multiple Acts,
> Errors or Omissions* means all acts, errors or omissions in rendering
> *Professional Services* that are logically or causally connected by any
> common fact(s), circumstances, situation, transaction(s), event(s)
> advice or decisions."

 Doc. 1, Ex. 1, Form PL-1000-A (rev. 8/05), Section I. INSURING AGREEMENTS, C. Limits

of Liability, Sub-Limits and Deductibles; Section IV. DEFINITIONS, ¶¶ (c)(I).

Camico argues that it is entitled to summary judgment because the acts of

malpractice committed by Presser are all "logically and causally connected" to a common

fact — that Presser wrongly treated the Rogozinskis' patent royalties as ordinary income

11

rather than capital gains income.  Doc. 34.  Conversely, the Rogozinskis argue that their claims cannot be construed as one claim under the policy because Presser owed each marital couple separate and distinct duties for each tax year. Docs. 37, 46.

The Rogozinskis' argument belies the plain language of the Policy. Because the Policy is a professional liability policy, meant to protect and defend against claims of malpractice, presumably every claimant argues that he is owed a duty of care.  However, the express language of the Policy provides that more than one claimant may make multiple claims and still be subject to the per claim limit.  Thus, the Rogozinskis' argument that their claims are separate because they are owed separate duties does not accord with the unambiguous Policy language.

Moreover, the Rogozinskis' contention that their claims are not related because Presser had a separate duty to evaluate the Rogozinski's tax returns each year, as well as a duty to evaluate individually each licensing agreement is equally inconsistent with the Policy language.  Even if Presser breached a separate duty each year of its relationship with the Rogozinskis, the Policy provides that a single per claim limit may apply to multiple acts, errors, or omissions; it does not except those acts, errors, or omissions that breach separate duties.

Although the per claim limit may apply to multiple persons claiming multiple breaches of care, the acts must be connected by more than an attenuated link.  See Wendt, 205 F.3d at 1263 (quoting with approval Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989)). Here, the claims of the Rogozinski brothers share common facts, circumstances, situations, transactions, events, advice or decisions.  See Doc. 1, Ex. 1 Section IV. DEFINITIONS, ¶¶

12

(c)(I). The undisputed facts make it plain that this venture was undertaken by the brothers jointly, with the expectation that profits would be split evenly among the three. See Doc. 64, part A. For example, the brothers own a joint bank account for the maintenance of the patents and each brother shares equally the expenses and profits from it. Id. at 4. Also, both licensing agreements were signed by all three brothers. Id. at 7.

The accountants, also, were the same as to each brother, and met only with Sam Rogozinski who represented the interests of the Rogozinskis vis-a-vis the accountants over the course of some seventeen years. Id. at 5. When the brothers received 1099s Sam forwarded the forms to Presser and instructed the firm on how to divide the income. Id. Also, it was Sam who discovered via the brothers' tax attorney that Presser misclassified the brothers' royalty income. Id. Sam conferred with Mr. Edelman, the Rogozinskis' then-primary accountant regarding the treatment of the royalties. Id. at 6. When Presser discovered its mistake it met with all three brothers as a group to discuss the consequences. Id. These facts paint the picture not of three individuals conducting separate business, but of three individuals engaging in a common and joint business entity. The Rogozinski brothers were treated as a unit by the Presser firm, and further, saw themselves as a unit which could be adequately represented vis-a-vis the firm by one brother. Thus, the brothers' claims are "logically" and "causally connected" by "common facts, circumstances, situations, transactions, events, advice or decisions."

Further, all harm arising from Pressers' multiple breaches can be attributed to one fact: in 1989 Presser did not employ the proper care to discover whether the Rogozinskis' royalty income should be classified as capital gains. All injuries or acts that occurred after

13

Presser's initial mistreatment of the royalty income constitute a series of errors alike in kind and injury.  Thus, Pressers' acts are logically and causally connected, i.e. the same accountant made the same error for several years in a row concerning a joint business of the three brothers, resulting in errors in each of their individual tax returns.  Under the language of the Policy, then, the Rogozinskis are subject to the per claim limit.

### III.  The Case Law

This analysis is consistent with Eleventh Circuit case law.  In support of their argument, the Rogozinskis cite three cases: Beale v. American National Lawyers Insurance Reciprocal, 843 A.2d 78 (Md. 2004); Scott v. American National Fire Insurance Co., 216 F. Supp. 2d 689 (N.D. Ohio 2002); and Lexington Ins. Co. v. Lexington Healthcare Group, Inc., Case No. X07CV064023116, 2009 WL 1218784 (Conn. Super. Apr. 13, 2009).[3]  In Beale, five minor siblings sued their attorney for negligent representation during their suit against their landlord for recovery of damages arising from incidents of lead paint poisoning.  Beale, 843 A.2d at 81-81.  The insurance policy stated: "The Per claim Limit of Liability stated in the Declarations Page is the limit of the Company's liability for all Damages arising out of the same, related or continuing Professional Services without regard to the number of claims

---

[3]    The Rogozinskis filed a Notice of Additional Authority (Doc. 68) on July 31, 2012, attaching Citizens Property Insurance Corp. v. Cook, Case No. 5D11-1555 (5th DCA July 20, 2012).  The Rogozinskis state that they do not argue that the attached case is applicable to these matters, but are attaching it to inform the Court of its existence.  The attached case is not applicable.  The policy in that case is not a professional liability policy but a home insurance policy protecting against "bodily injury" and/or "property damage."  Additionally, the policy language at issue in Cook is substantially different than the language at issue here.  Particularly, there the Florida Fifth District Court of Appeals was attempting to define the term "occurrence" as opposed to the term "claim."

made, demands, suits proceedings, claimants, or Persons Insured involved." Id. at 82. The circuit court entered summary judgment in favor of the insurance company, and the Court of Appeals of Maryland reversed. Id. at 82, 93. After a thorough review of relevant case law, the court found that the terms "same" and "related" were ambiguous and construed the contract against the drafter and in favor of the claimants — "[t]hat would mean applying the aggregate limit of liability." Id. at 89. The court noted that the extent of the poisoning and ultimately the damages due to each child were distinct, and thus, a result in one case would not necessarily foreshadow the result in another's. Id.

Cited by both Beale and the Rogozinskis, Scott involved an attorney who helped create a corporation and was subsequently sued by that corporation and its investors, who claimed that Scott failed to protect their separate interests. Scott, 216 F. Supp. 2d at 691. The relevant portion of the policy read: "Claims alleging, based upon, arising out of or attributable to the same or related acts, errors, or omissions shall be treated as a single claim regardless of whether made against one or more than one insured." Id. at 693. The court concluded that the claims were not related, because the attorney owed a separate duty to each investor and the investors' rights were independent from the corporation's rights. Id. at 695. Further, the court found that the harm to the investors was distinct from the harm suffered by the corporation. Id.

Finally, the Rogozinskis cite Lexington for support. In Lexington, sixteen individuals living in an adult living facility perished in a fire started by another patient. Lexington, 2009 WL 1218784 at *1. The plaintiffs sued the facility for: 1) failing to supervise the patient responsible for starting the fire; and 2) failing to respond properly to the fire, including the

15

failure to properly evacuate the patients and render the patients appropriate treatment. Id. at *8. The court found that the two acts were unrelated because the facility owed a separate duty to each differently situated patient. Id. at *10.

These cases are not binding on the Court, nor are they persuasive in this context. First, the court in Beale specifically found the term "related" to be ambiguous, and thus construed the language of the contract against the insurer. In this Policy, however, the term "related" is never used. Rather, the Policy states that a Claim may arise from "Multiple Acts, Errors or Omissions," which are defined as acts that are "logically and causally connected." Consequently, it appears that instead of using the term "related," Camico chose to substitute that term with its definition. Indeed, the Eleventh Circuit defines "related" this very way. Wendt, 205 F.3d at 1262. Thus, the language of the Policy is not ambiguous, and the Court need not construe the Policy against Camico.

Next, the court in Beale noted that those claims were unrelated because success on one claim would not necessarily foreshadow success for any other claim. Here, the claims against Presser are essentially the same; the harm is identical as is the injury. Cf. Cont'l. Cas. Co. v. First Arlington Inv. Corp., 497 So. 2d 726, 728 (2d DCA 1986) (finding that the acts at issue were unrelated in part because the case was "not a case where a lawyer was representing two clients with consistent positions."). If one brother succeeded in proving that Presser committed malpractice by classifying his royalty income as ordinary income, the other brothers would succeed as well. Unlike the plaintiffs in Beale, then, the results as to one Rogozinski brother in the underlying case would dictate the results of the others.

Third, <u>Scott</u> and <u>Lexington</u> are inapplicable because the policies in those cases are dissimilar to the Policy here.  In <u>Scott</u>, the relevant provision of that policy allowed for multiple claims against one or more insured, but did not provide for claims brought by multiple persons against an insured.  Therefore, although the court in <u>Scott</u> may have reasonably found claims unrelated because of an attorney's duty to separate claimants, in this instance, such reasoning contradicts the specific language of the Policy.    Finally, the policy in <u>Lexington</u> was a medical malpractice policy, and immaterial to the analysis of this action.

Rather, the Court is guided by the Eleventh Circuit's decision in <u>Continental Casualty Co. v. Wendt</u>.  <u>Wendt</u> is a per curiam decision that appends and adopts the District Court's order.  Somewhat similar in background to the facts of <u>Scott</u>, in <u>Wendt</u> investors of a corporation filed a class action against an attorney for giving inaccurate legal advice and for making false and misleading statements regarding the legality of certain investments as securities.  <u>Id.</u> at 1260.  Another suit was soon brought against the broker of the investments, who promptly filed a third party complaint against the attorney, alleging that the attorney made misrepresentations to him regarding the legality of such investments.  <u>Id.</u>  The relevant policy language stated "the limit of liability stated for 'each claim' is the maximum we will pay for all claims and claim expenses arising out of, or in connection with, the same or related wrongful acts."  <u>Id.</u>

The court defined the term "related" broadly, as a "logical or causal connection between two events." <u>Id.</u> at 1262.  Thereafter, the court found that all of the attorney's acts were related, noting that the language of the policy focused only on wrongful acts and not on duties breached.  <u>Id.</u> at 1263.  Specifically, the court held that "[t]he fact that these acts

17

resulted in a number of different harms to different persons, who may have different types of causes of action against [the attorney] does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract.  Rather they comprised a single course of conduct designed to promote investment . . . ."  Id. at 1264.

Also persuasive is a case from the Southern District of Florida, Vozzcom v. Great American Ins. Co., 666 F. Supp. 2d 1332 (S.D. Fla. 2009).[4]  In Vozzcom, the court found related a series of lawsuits filed by three separate employees against their employer for unpaid overtime compensation. 666 F. Supp. 2d at 1339.  Although one plaintiff brought their suit over a year after the original plaintiffs filed, the court emphasized that all three employees were employed by Vozzcom in the same positions during the same period and all three were denied overtime coverage during the course of their employment. Id.  Similar to this case, each plaintiff in Vozzcom complained of numerous violations that occurred over a period of time, but the court nonetheless found the claims were related. Id. at 1331, 1335, 1339.  The court in Vozzcom explained that "[the] approach does not require exact factual overlap, or even identical legal causes of action, but rather focuses simply on whether the claims are logically linked by a 'sufficient factual nexus.'" Id. at 1338 (quoting Capital Growth Financial LLC v. Quanta Specialty Lines Ins. Co., 2008 WL 2949492, at *4 (S.D. Fla. July 30,

---

[4]      In both its motion and its response (Docs. 34, 47) Camico relies heavily on Eagle American Ins. Co. v. Nichols, 814 So.2d 1083 (4th DCA 2002).  In Eagle American, an attorney failed to name multiple parties in his client's medical malpractice suit. Id. at 1084. The appellate court found that the attorney's multiple failures were related acts. Id. at 1087. Specifically, the court noted that the client suffered only one injury, the loss of his potential damages. Id.  While the analysis in Nichols is helpful, both Vozzcom and Wendt are more factually analogous.

2008)).  Both Wendt and Vozzcom are consistent with the Court's interpretation of the Policy.

As in these cases, even though the Rogozinskis, to whom Presser each owed a duty of care,

brought multiple causes of action that accrued over a period of time, the wrongful acts were

"a single source of conduct" and thus "logically" and "causally connected."

As the Rogozinskis rightfully point out, many of the cases in Florida do not concern

the application of aggregate policy limits.  Doc. 47 at 4.  For example, both Wendt and

Vozzcom evaluate whether a later-filed suit relates to previous suits for the purpose of

determining whether the insurers had any duty to defend the insured.  However, although

Wendt and Vozzcom pose factual distinctions from this case, both of the opinions interpret

similar policy provisions to those at issue here.

Indeed, in Wendt, the court analyzed the term "same or related wrongful acts," which

the court found to mean "logically or causally connected," the very language Camico chose

for its Policy.  Wendt, 205 F. 3d at 1262.  Also, the policy discussed in Vozzcom stated that

"[m]ore than one Claim involving the same Wrongful Act or Related Wrongful Acts of one or

more Insureds shall be considered a single claim . . . . Related Wrongful Acts shall mean

Wrongful Acts which are logically or causally connected by reason of any common fact,

circumstance, situation, transaction, casualty, event, or decision."  Vozzcom, 666 F. Supp.

2d at 1334-35.  This language is nearly identical to the Policy language at issue here.

Additionally, the court in Wendt found the opinion of  Gregory v. Home Ins. Co., 876

F.2d 602 (7th Cir. 1989) to be persuasive, stating that the Seventh Circuit's holding was

"harmonious with Florida law."  Id. at 1263.  The Gregory opinion analyzes whether claims

are related for the purpose of applying either a per claim or aggregate policy limit.  Gregory,

19

876 F.2d at 603.  Therefore, although the opinion in <u>Wendt</u> does not analyze whether claims are related for purposes of applying aggregate policy limits, it uses as its model an opinion that addresses that very issue.

The Court recognizes that the Camico Policy language is broad.  Nevertheless, the language is also clear and unambiguous, and Florida courts construe policies "in accordance with the plain language of the policy."  <u>Siegle v. Progressive Consumers Ins. Co.</u>, 819 So. 2d 732, 735 (Fla. 2002).  Of course, "[a]t some point . . . a logical connection may be too tenuous reasonably to be called a relationship."  <u>Gregory</u>, 876 F.2d at 606 (quoted with approval by <u>Wendt</u>, 205 F.3d at 1263).  Claims require a sufficient factual nexus to be related. <u>See</u> <u>Vozzcom</u>, 666 F. Supp. 2d at 1338.  However, unlike a hypothetical posed by the Rogozinskis, this is not a case of malpractice where the injured individuals have nothing in common except for their unfortunate choice in representation.  Here, the individuals are business partners who treat their business as a joint enterprise, all deriving income from the same source, and all suffering from the same mistake made by their shared accountants relating to that joint enterprise.  The Court limits its decision to the facts of this case.

The Court's application of the undisputed facts of this case to the Policy language dictates a finding that the accountants' negligent acts were "logically" and "causally" connected" and therefore subject to the per claim claim limit . <u>See</u> <u>Wendt</u>, 205 F. 3d at 1264; <u>Vozzcom</u>, 666 F. Supp. 2d at 1338 (citations omitted).

20

Accordingly, it is hereby

**ORDERED:**

1.      Plaintiff Camico Mutual Insurance Company's Motion for Final Summary Judgment (Doc. 34) is **GRANTED**.   In accordance with the language of the Policy, for purposes of insurance coverage, Defendants Abraham Rogozinski, Marjorie Rogozinski, Chaim Rogozinski, Jeanie Rogozinski, Sam Rogozinski and Randi Rogozinski asserted only one claim against Defendant Presser, Lahnen, & Edelman P.A.  The clerk shall enter a declaratory judgment that Plaintiff Camico Mutual Insurance Company's $1,000,000.00 per claim limit in policy number FLL01165-05 applies to Defendants Abraham Rogozinski, Marjorie Rogozinski, Chaim Rogozinski, Jeanie Rogozinski, Sam Rogozinski and Randi Rogozinski's claim against Defendant Presser, Lahnen, & Edelman P.A.

2.      Defendants Abraham Rogozinski, Marjorie Rogozinski, Chaim Rogozinski, Jeanie Rogozinski, Sam Rogozinski and Randi Rogozinski's Motion for Summary Judgment (Doc. 37) is **DENIED**.

3.      The clerk should close the file.

**DONE and ORDERED** in Jacksonville, Florida this 13th day of September, 2012.

TIMOTHY J. CORRIGAN
United States District Judge

kh.
Copies To:
Counsel of Record